Title Guarantee and Trust Company, Trustee under Deed of Trust dated May 5, 1917 by Mary A. Bedford v. Commissioner.
Title Guar. & Trust Co. v. Commissioner
Docket No. 110036.
United States Tax Court
1943 Tax Ct. Memo LEXIS 412; 1 T.C.M. (CCH) 740; T.C.M. (RIA) 43115; March 9, 1943
*412 William T. Griffin, Esq., for the petitioner. Thomas R. Charshee, Esq., for the respondent. DISNEY
Memorandum Findings of Fact and Opinion DISNEY, Judge: This proceeding involves income tax for the calendar year 1938. The respondent determined a deficiency in the amount of $6,517.03, all of which is in issue. The only question presented is whether petitioner is entitled to a capital loss upon the sale of stock in the taxable year, or whether the stock had become worthless prior to that year, as determined by the Commissioner in the deficiency notice and contended by the respondent. A stipulation of a considerable portion of the facts was filed. We adopt such stipulation and find the facts therein set forth. Such stipulated facts, so far as necessary to consideration of the issue presented will be summarized and included with our findings of fact made from other evidence adduced, as follows: Findings of Fact The income tax return of the petitioner was filed with the collector of internal revenue for the second district of New York. The petitioner in 1929 acquired at a cost of $91,000, 1000 shares of the 7 per cent cumulative preferred stock of The Prudence Company, Inc. (hereinafter *413 referred to as Prudence). The stock had originally been issued to Realty Associates, Inc., and was later sold to the public. Realty Associates, Inc., changed its name to New York Investors, Inc. (hereinafter called Investors). On the back of the stock certificates the following guaranty appears: REALTY ASSOCIATES, being the first holder of the shares of stock represented by this Certificate, in consideration of the purchase thereof from it, hereby guarantees to the above named stockholder and assigns, when and if registered on the books of The Prudence Company, Inc., as the owner of the shares of stock represented by this certificate, prompt payment semi-annually on the required dates, of dividends amounting to Seven per cent (7%) per annum upon the said shares of stock. Upon payment made by Realty Associates hereunder to any holder of said shares, Realty Associates shall be subrogated to the rights of any holder (present or future) of said shares with respect to the dividends on account of which such payment was made. Regular dividends were paid semiannually upon the stock to May 1, 1932, but defaulted thereafter. The principal business of Prudence consisted of lending money *414 secured by bonds and first mortgages on improved incomeproducing real estate. After the business depression, beginning in 1929, the income of Prudence dropped sharply, and to stave off collapse, the company borrowed $20,000,000 from the Reconstruction Finance Corporation in April 1932. After the Bank Holiday of 1933, Prudence was permitted to operate only on a restricted basis. In June 1933, a Bondholders Protective Committee was formed, and a plan of reorganization proposed, but never put into effect. In September 1934 the company was taken over by the Superintendent of Banks of the State of New York. In January 1935 Prudence filed a petition for reorganization under Section 77B of the Federal Bankruptcy Act, in the United States District Court for the Eastern District of New York. After some litigation as to jurisdiction of that court, the court in July 1936 set November 16, 1936 as a tentative date for filing of a plan of reorganization. On February 16, 1937, under an extension of time, Prudence filed a plan of reorganization. On April 30, 1937, a Special Master was appointed to take testimony and report to the court upon the solvency of the company and the proposed plan of reorganization. *415 On October 7, 1937, the Special Master submitted his report, reciting, inter alia, "Insolvency has been clearly established. Not even a close question arises. A fair valuation of its assets, made in summarized fashion, shows the assets would, at best, only liquidate a portion of its liabilities." The Special Master set November 17, 1937, for the filing, and December 1, 1937, for the hearing, upon any amended plans of reorganization. The report of the Special Master came on for hearing before the court on October 15, 1937, at which time attorneys representing various parties, although not opposing the report, requested the court to reserve decision on the motion to confirm. The court, therefore, reserved its decision, and on April 25, 1938, entered an order ratifying, approving and confirming the report of the Special Master, finding the debtor to be insolvent. The order further reads: FOUND, DECLARED, ORDERED AND ADJUDGED that said debtor is insolvent within the true intent and meaning of Section 77B of the Federal Bankruptcy Act of 1898 as amended. In June 1937, upon an appeal from an attack by Prudence upon the validity of the pledge of assets to the Reconstruction Finance *416 Corporation, the United States Circuit Court of Appeals for the Second Circuit issued an order granting the Reconstruction Finance Corporation the right to foreclose on the collateral securing its $20,000,000 loan to Prudence. On January 7, 1935, the United States District Court for the Eastern District of New York approved a petition for the reorganization of Investors, under Section 77B of the Bankruptcy Act, and on February 23, 1938, the petitioner filed, on a printed form issued "merely for the convenience of claimants," a proof of claim in that proceeding, reciting that it was the owner of 1,000 shares of the cumulative preferred stock of Prudence, that the dividends thereon had been guaranteed by Investors, that Prudence had been in reorganization proceedings under Section 77B since about February 1935, and had been judicially found to be insolvent, and that Prudence was on January 7, 1935, insolvent and "on that date was and will continue to be utterly unable to pay any dividends whatsoever on said Preferred Stock," and that the sum of $115,750, the par amount of the preferred stock and the unpaid dividends in arrears thereon on January 7, 1935, is justly owing from Investors *417 to the claimant. On December 16, 1938, the petitioner, through a broker disposed of the 1,000 shares of stock, receiving therefor $70 from which the broker deducted $20 as his commission. The petitioner paid $70 Federal stock transfer stamps and New York State stock transfer stamps in connection with the transaction. On December 29, 1938, the petitioner assigned to one Arthur Miller all of its right, title and interest in and to the 1,000 shares of stock "and all right, title and interest of the undersigned in the accrued and unpaid dividends thereon and in the guaranty by New York Investors, Inc., of payment of semi-annual dividends thereon, and all right, title and interest of the undersigned in and to any and all claims against New York Investors, Inc., * * * founded upon any rights or interest represented by said Preferred Stock and said accrued and unpaid dividends in arrears, and said guaranty." On December 2, 1938, the United States District Court for the Eastern District of New York adjudicated Investors a bankrupt and directed creditors to file claims. There was available $500,000 in cash for application to unsecured creditors' claims of $30,000,000. About February 1940, *418 Arthur L. Miller, as assignee of petitioner's claim against Investors was paid out of the assets of Investors $1,964.74, representing a dividend of.016974 per cent upon his claim of $115,750. The petitioner deducted on its income tax return for 1938, $45,475 as a 50 per cent recognized loss upon $90,950, acknowledging cost of $91,000 and amount realized of $50. In the deficiency letter dated November 29, 1941, the Commissioner disallowed the deduction on the grounds the stock became worthless prior to 1938. The Commissioner took the position the stock became worthless in 1937 and allowed a loss of $91,000 in petitioner's return for 1937, resulting in an overassessment for 1937 of $169.50. The petitioner has not accepted such overassessment. Petitioner's return for 1937 reports total income of $417,375.11, certain taxes and other deductions of $9,343.81, leaving a balance of $408,031.30. It also reports $402,912.56 as distributable to beneficiaries, resulting in net income of $5,118.74 and a total tax of $169.50. Opinion The Commissioner determined in the notice of deficiency that the stock here involved became worthless prior to the taxable year 1938. More accurately expressed *419 later, his view was that it became worthless in 1937, and upon consideration of the two years, 1937 and 1938, he allowed the loss in full to the petitioner in 1937 with the result that there was an overassessment for that year. Petitioner, however, has not accepted the overassessment and takes the view that the loss occurred in 1938 when the stock was sold. The burden is, of course, upon the petitioner to prove that the stock did not become worthless prior to 1938, as determined by the Commissioner. That the Prudence Co. was in straitened financial circumstances from 1932 on is obvious. Its affairs were in the courts and reorganization was sought under Section 77B of the Bankruptcy Act. Indeed in the proof of claim which the petitioner filed against Investors on February 23, 1938, it is recited that the Prudence Co. was insolvent on January 7, 1935. We notice, however, that this printed form was issued apparently by the trustees or referee in bankruptcy "merely for the convenience of claimants" and we think we could not with fairness base our conclusions herein upon the inclusion in the body of the printed form, of the statement as to insolvency. Whether there was insolvency prior *420 to 1938, is a question of fact, hardly to be resolved upon a mere conclusion expressed in the printed form signed by the petitioner. Nor can we feel that even the opinion of the Special Master, expressed in his report in October 1937, that insolvency had been clearly established, can be considered as the identifiable event which a long line of cases indicates as perhaps the best criterion by which to judge the worthlessness of property. The Special Master's report was subject to approval or disapproval by the court, and it was not approved until April 25, 1938, at which time, although the report was approved and confirmed, the court specifically ordered and adjudged "that said debtor is insolvent within the true intent and meaning of Section 77B of the Federal Bankruptcy Act." If the situations of the parties here were reversed and the petitioner were attempting to show worthlessness of the stock in 1937, we think that the Special Master's report would not be acceptable as sufficient demonstration of insolvency of Prudence. However, the question before us is not the insolvency of Prudence, but the worthlessness of the stock involved, and the stock had behind it not only the assets *421 of Prudence, but those of Investors, by virtue of the guaranty by Investors. We can not agree with the respondent's view that the petitioner's stock was a matter separable from that of the guaranty by Investors endorsed thereon. The endorsement guarantees to the stockholder and his assigns "as the owner of the shares" so that it is apparent that no one but the owners of the shares could get the benefit of the endorsement. In other words, the stock and the endorsement of guaranty could not be held by different owners. We consider them inseparable. The guaranty was endorsed by the first holder of the shares of stock, then Realty Associates, for the benefit of later holders. A buyer from Realty Associates, and his assignee, purchased a contract inseparable attached to stock. However, even if the stock and guaranty were considered separable, it would still remain true that the value of the stock was directly affected by the guaranty - and we are here interested in the value of the stock. The ordinary function of an endorsement is to strengthen the value of the instrument endorsed. Otherwise it would be, under ordinary circumstances, at least, without purpose. Therefore the endorsement *422 and the financial condition of the endorser must be considered in adjudging the worth, or lack of worth, of the stock. We do not think that this principle is affected by such cases as McCune v. Driscoll, Fed. Supp. (U.S.D.C.W. Dist. of Pa., February 16, 1940), cited by the respondent, for that case merely held that dividends received, not from the corporation issuing the stock out of its earnings or profits, but from guarantors did not reduce the basis of the stock. We find no reason in that conclusion for believing that the value of stock does not depend upon the worth of its guarantor. The record before us is that the guarantor, Investors, was adjudicated a bankrupt on December 2, 1938. It was not until after that time and on December 16, 1938, that the petitioner sold the stock; and the vendee actually collected, upon the assignment to him of the petitioner's claim, the sum of $1,964.74, or.016974 per cent upon the claim of $115,750 for the stock and accrued dividends thereon. Under such circumstances it can not soundly be said, in our opinion, that the stock was valueless prior to 1938. Though the guaranty in terms went only to the 7 per cent dividends, the holders *423 of the stock had against Investors and its other creditors a right to such sum as would compensate for the loss of 7 per cent per annum. In (355), and in , it was held that the par value of stock so guaranteed was a reasonable reflection of the value of the guaranty. That the claim for $115,750, representing the par value of the stock, plus accrued dividends, was allowed by the court in the bankruptcy of Investors is proven by the fact that.016974 per cent of that amount is $1,964.74, the amount received upon the claim. In other words, in 1938 and thereafter the rights in the stock which petitioner disposed of in 1938 represented a claim duly sustained of $115,750 against Investors, and that claim eventually paid $1,964.74 in 1940. We decline to say that such claim was worthless prior to 1938. That claim was owned by petitioner as owner of the stock; and in fact, to be accurate in this matter, the loss was taken, not merely upon stock, but upon the rights involved in and with such stock. Those rights are what *424 petitioner paid for, and the disposition thereof is the cause of any loss sustained. The respondent argues that the sale in December 1938, while it "may have been a bona fide sale in the sense that it was an actual and not an accommodation sale" was "futile, and in this instance, an expensive gesture, unnecessary to establish the loss, since the record clearly shows the 'Prudence' stock became worthless prior thereto in the year 1937." Cases are cited to indicate that a futile and expensive sale is fictitious. We find none of them involving facts such as here at hand, where the vendee later realizes practically $2,000 from his investment. We do not think such sale fictitious, even if there was not realized from it enough to pay commissions and stamps. There is no contention that it was not a real sale in every other sense, and we have above concluded that the stock had not theretofore become worthless. We conclude and hold that the petitioner took a loss upon the sale of the stock in 1938. Decision of no deficiency will be entered.